IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger

Civil Action No. 17-CV-1773-MSK-MEH

**HILAND HILLS TOWNHOUSE OWNERS ASSOCIATION, INC.,**

    Plaintiff,

*v.*

**OWNERS INSURANCE COMPANY,**

    Defendant.

---

## <u>AMENDED</u>[1] OPINION AND ORDER ON MOTION FOR SUMMARY JUDGMENT

---

**THIS MATTER** comes before the Court upon the Defendant's Motion for Summary Judgment (**# 23**), the Plaintiff's response (**# 42**), and the Defendant's reply (**# 44**). For the reasons that follow, the Motion is <u>denied</u>.

### I. JURISDICTION

The Court exercises jurisdiction under 28 U.S.C. § 1332.

### II. BACKGROUND[2]

Plaintiff Hiland Hills Townhouse Owners Association ("Hiland Hills") owns a multi-unit housing complex in Denver, Colorado. From November 2014 to November 2015, that property

---

[1] This Amended Opinion corrects a typographical error in the introductory paragraph of the original that incorrectly indicated that the Motion for Summary Judgment was "granted." As corrected herein, the motion is denied.

[2] The Court recounts the undisputed facts and the disputed facts in the light most favorable to Hiland Hills, the nonmoving party. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

1

was covered by a casualty insurance policy ("the Policy") issued by Defendant Owners Insurance Co. ("Owners").

On June 24, 2015, a severe hail storm occurred over Hiland Hills' property. Hiland Hills' property manager and a roofing contractor examined the roof systems of the buildings after the storm, but neither observed any visible hail damage at that time. As a result, Hiland Hills did not make any immediate claim upon Owners under the Policy.

In June 2016, Hiland Hills undertook an unrelated project to replace the roof of one of its buildings, and observed that the roof's membrane exhibited "star fractures" which Hiland Hills believed evidenced hail-caused damage. Thereafter, on November 7, 2016 – some 17 months from the initial incident -- Hiland Hills filed a claim with Owners, contending that the June 2015 hail storm caused property damage that was covered by the Policy.

Owners retained a company called Envista Forensics ("Envista"), and its Engineer Amber Prom, to conduct inspections and evaluate Hiland Hills' claim and to answer two questions: (i) "[i]f the . . . roofing located atop Buildings F, H, I, J, and K was hail-damaged. . . ." and (ii) "[t]he most probable date in which the hail damage occurred." This second question was based on the fact that, on May 24, 2016 -- after the Policy had lapsed, but before Hiland Hills made its claim -- a second hail storm struck the Hiland Hills property. Hiland Hills contends that this storm produced hailstones that were "very soft and splattered with ease" upon impact with surfaces and rejects the notion that the May 2016 storm was the cause of any property damage.

On August 2, 2017, Envista issued its report. Ms. Prom concluded that: (i) hail was a possible cause of the damage to the roof membranes of the buildings in question, but (ii) "[e]ither the June 24, 2015 or the May 24, 2016 hail storms had the potential to have caused the

observed hail damage, with the maximum damage having been caused by the storm with the largest hailstones, that being the May 24, 2016 hail storm."

Based on Envista's report, on September 1, 2017, Owners wrote to Hiland Hills, informing it that it was rejecting the Proof of Loss. Owners gave a variety of reasons for that decision, including: (i) Hiland Hills' failure to give prompt notice of the loss to Owners and that the passage of time, intervening repairs, and additional storms in the interim prejudiced Owners' ability to investigate the claim; and (ii)) Envista's report concluded that the predominant damage to the property was caused by the May 2016 hailstorm, at a time when the Policy was not in effect.

As framed in the Amended Complaint **(# 9)**, the operative pleading in this case, Hiland Hills asserts four claims: (i) a claim for a declaratory judgment that Owners must abide by the Policy's provisions for conducting an independent appraisal of the claimed loss; (ii) common-law breach of contract, presumably under Colorado law, in that Owners breached the Policy by "failing to properly and timely adjust the loss" and "by failing to pay all benefits due and owing under the Policy"; (iii) common-law bad faith, presumably under Colorado law, in that Owners "committed unfair claim settlement practices," such as "failing to acknowledge and act properly upon communications" relating to the Policy, "failing to adopt and implement reasonable standards for the prompt investigation of claims," and "refusing to pay claims without conducting a reasonable investigation," among others; and (iv) violation of C.R.S. § 103-1115 and -1116, in that Owners delayed or denied payment of the claim in violation of "objective industry standards for claim handling and payment."

Within a few months of the commencement of the case, Owners filed the instant Motion for Summary Judgment **(# 23)**. The motion seeks judgment on all four claims based on a single

3

argument applicable to all four claims - that Hiland Hills' failure to give prompt notice of the claim operates to excuse Owners from any further obligations under the Policy. Hiland Hills' response raises two issues: (i) a legal argument that, under Colorado law, an insurer may not deny a claim as untimely absent a showing that it has suffered some prejudice as a result of the late notice of claim, and (ii) a factual argument that Ms. Prom's inability to trace the roof damage to one of the two hailstorms does not demonstrate prejudice to Owners because there is, at least, a genuine dispute of fact as to whether the May 2016 hailstorm was sufficient to cause the observed damage. Thus, the Court limits its analysis to those two issues.

### III. LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof, and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(c)(1)(A). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus. Inc. v. Arvin Indus. Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

## IV.  DISCUSSION

### A.  Whether Hiland Hills' notice was "prompt"

Owners relies upon a provision in the Policy that states that Hiland Hills "must . . . give [Owners] prompt notice of the loss or damage" following an occurrence. The Policy does not otherwise define the term "prompt."

Under Colorado law, insurance contracts are construed according to their plain and ordinary meaning. *Metro Wastewater Reclamation Dist. v. Fireman's Fund Ins. Co.*, 35 Fed.Appx. 839, 842 (10th Cir. 2002). A requirement that an insured give "prompt" notice of a

loss to the insurer requires that the insured report the loss "within a reasonable length of time under all the facts and circumstances of each particular case." The purpose of such a requirement is "to give the insurer an opportunity to make a timely and adequate investigation of all the circumstances," and to avoid "the possible removal or lapse of memory on the part of witnesses, the loss of opportunity for examination of the physical surroundings . . . and the possible operation of fraud [or] collusion." The question of whether notice was given sufficiently promptly is ordinarily a question of fact, but where the facts are undisputed and only one inference can be drawn therefrom, the Court may resolve the question of promptness as a matter of law. *Certified Indem. Co. v. Thun,* 439 P.2d 28, 30 (Colo. 1968).

The limited facts presented here are, effectively, undisputed. Immediately after the June 2015 hail storm, Hiland Hills' Property Manager, Robert Smock, received complaints from residents about leaking roofs. Mr. Smock's inspections – the extent of which are not described in the record – attributed those problems to gutters and roof drains clogged with foliage dislodged by the storm. Mr. Smock also reports that Hiland Hills "dispatched a roofing contractor, Weathersure, to investigate and repair the reported roof leaks." Although Weathersure "promptly fixed the roof leaks, [it] did not advise of any visible hail-caused damages" either. It was not until June 10, 2016, a year later and "during the course of [a] building's roof removal" that Mr. Smock and a representative from Impact Claims Service, a public adjuster retained by Hiland Hills, discovered damage to the underside of the roof's

membrane.³ The record does not specifically address what Hiland Hills did in the interim, but ultimately it reported the loss to Owners some five months later, on or about November 7, 2016.⁴

On the limited record before it, the Court concludes that, as a matter of law, Hiland Hills' notice to Owners was not "prompt." The record, taken in the light most favorable to Hiland Hills, indicates that the damage to the roof membrane was not visible to an observer conducting a simple visual inspection of the roof. Thus, it would not be surprising that Mr. Smock and Weathersure's visual inspections of the roof in 2015 revealed no basis for Hiland Hills to assume it had sustained a loss at that time. In short, then, the record reflects that Hiland Hills first had <u>actual</u> notice of the loss on June 10, 2016. Owners would certainly like to move that date back to the time of the storm in June 2015, but it has neither come forward with evidence that Hiland Hills had <u>actual</u> notice of the loss at that time, nor has it come forward with evidence that suggests that Hiland Hills <u>should</u> have observed the damage earlier -- even Ms. Prom's report concedes that "[v]isual and tactile inspection of the top surface of the [roof] revealed no evidence of hailstone impact."

---

³ There is a discrepancy in the record on this point. Mr. Smock's affidavit places Hiland Hills' discovery of the damage to the membrane at June 10, 2016. However, the Proof of Loss submitted by Hiland Hills – which was written by Impact Claim Services– reports that Impact had made its first inspection of the property and observed hail-caused damage on May 11, 2016, a full month earlier. The distinction is significant, as the May 2016 inspection (and a second inspection by Impact occurring about a week later) took place before the May 24, 2016 second hail storm, whereas Mr. Smock's June 2016 discovery of the damage occurred after that second storm. The parties have not addressed this factual disparity. Because Hiland Hills' briefing refers only to Mr. Smock's affidavit, and Owners' briefing does not argue otherwise, the Court will treat Mr. Smock's percipient testimony as dispositive for purposes of this Order.

⁴ Hiland Hills sometimes takes the position that it reported the loss to Owners in late October 2016, although it does not point to a document embodying that date. Thus, the Court adopts Docket # 23-4, the actual Notice of Loss, as supplying the notice date. Nevertheless, the outcome of the analysis herein would not change were the Court to adopt an earlier notice date.

Thus, the question presented is whether a roughly five-month delay – from June 10, 2016 to approximately November 7, 2016 – is unreasonable, such that the Court can say as a matter of law that it was not "prompt." Nothing in the record offers any explanation of any obstacle that prevented Hiland Hills from notifying Owners of the loss as soon as June 10, 2016. Nor does the record offer any explanation of what steps Hiland Hills undertook with regard to the roof damage between June and November 2016. The record simply reflects an unexplained five-month delay between discovery of the damage and notice to Owners. In *Clementi v. Nationwide Mut. Fire Ins. Co.*, 16 P.3d 223, 226 (Colo. 2001), the insureds under an uninsured/underinsured motorist policy "did not provide notice to [their insurer] until five months after they reasonably could have known about their claim." The Colorado Supreme Court held that their "delayed notice did not substantially comply with the notice provision in the [ ] policy"[5] as a matter of law. *Id.* There is little reason to hold differently here. Accordingly, the Court finds that Hiland Hills' notice to Owners was not "prompt" as a matter of law.

**B. The Notice/Prejudice rule**

The next question is whether, under Colorado law, Hiland Hills' late notice is, of itself, sufficient to allow Owners to disclaim coverage or whether Owners is required to show that the late notice prejudiced it in some way.

During the 1900s, Colorado followed the "traditional approach" in cases where insureds gave late notice of their claims, holding that "unexcused delay in giving notice relives the insurer of its obligations under an insurance policy, regardless of whether the insurer was prejudiced by

---

[5] The policy language in *Clementi* required the insured to give notice "as soon as practicable" upon suffering the loss. 16 P.3d at 225. This Court does not consider that obligation to be meaningfully different than the requirement of "prompt" notice here. *Thun* seems to suggest that that there is little difference among slight variations in policy language and that "terms such as 'immediate,' 'prompt,' 'forthwith,' 'within a reasonable time,' etc." all "essentially mean the same thing." 439 P.3d at 30.

8

the delay." *Clementi*, 16 P.3d at 227. That categorical rule was most recently articulated by the Colorado Supreme Court in *Marez v. Dairyland Ins. Co.*, 638 P.2d 286, 289-90 (Colo. 1981). However, at the start of the new century, the Colorado Supreme Court began to chart a different course. In *Clementi*, the court observed the emergence of a "modern trend" – one in which only Colorado and New York had not joined -- whereby states adopted a "notice/prejudice rule." This rule allowed late notice of a claim to permit an insurer to disclaim coverage only if the insurer showed that the late notice prejudiced it in investigating the claim. 16 P.3d at 228-29. *Clementi* took only a single step towards abandoning the traditional approach in favor of the modern trend, considering only whether the notice/prejudice rule applies in cases third-party uninsured/underinsured motorist ("UIM") claims. 16 P.3d at 225 ("this court refused to adopt the notice-prejudice rule in a liability insurance case," *citing Marez*, but that "this court has not previously considered whether the notice-prejudice rule applies in UIM cases"). It held that "insurer prejudice should now be considered when determining whether noncompliance with a UIM policy's notice requirements vitiates coverage." *Id.* at 230.

A few years later, the Colorado Supreme Court took another, larger step, by formally adopting the notice/prejudice rule in cases involving liability insurance. *Friedland v. Travelers Indem. Co.*, 105 P.3d 639, 647 (Colo. 2005). Like *Clementi*, the court was particularly persuaded by arguments that: (i) in both UIM and liability policies, the policy is usually one of adhesion, with the insured having little ability to bargain over policy terms; (ii) public policy favors the goal of compensating innocent tort victims, which would be harmed if insurers could avoid coverage due to late notice by the insured; and (iii) insurers should not reap a windfall by invoking technicalities to avoid coverage that would otherwise be available. *Friedland* also

9

made clear that the insurer bears the burden of demonstrating that the late notice caused it to suffer some prejudice to its ability to investigate or evaluate the claim.

In 2015, the Colorado Supreme Court declined to extend the notice/prejudice rule for "claims made" policies – that is, policies which "cover[ ] only those claims brought against the insured during the policy period and reported to the insurer by a date certain, typically within a brief window following expiration of the policy period." *Craft v. Philadelpha Indem. Ins. Co.*, 343 P.3d 951, 952 (Colo. 2015). It noted that it had approved the notice/prejudice rule with regard to "occurrence policies," which it defined as "provid[ing] liability coverage only for injury or damage that occurs during the policy term, regardless of when the claim is actually made," but it differentiated between those and "claims-made policies" that "provide coverage for claims against the insured brought within the policy period, even if the underlying event giving rise to liability occurred many years in the past." Claims-made policies contain "date-certain" deadlines for the insured to give notice of any claim, and the court found that these notice requirements "fulfill[ ] a very different function than a prompt notice requirement"; they "define the temporal boundaries of the policy's basic coverage terms" and the notice of the claim "is the event that triggers coverage." Observing that the notice/prejudice rule "would alter the parties' agreed allocation of risk" and would modify "a basic term of the insurance contract," the court declined to extent that rule to such situations.

Here, Owners argues in abbreviated fashion and without significant citations to supporting authority that *Friedland* does not apply because its rule "has not been extended to first party property coverage cases by the Colorado Supreme Court," and thus, "the current precedent of *Marez* . . . is the current standard." It offers no argument as to why the general principles articulated in *Clementi* and *Friedland* as favoring adopting of the notice/prejudice rule

10

there would not apply with equal force to the policy here. In its reply brief, it touches upon two of the three *Friedland* justifications: it observes that, unlike third-party liability cases like *Friedland* and *Clementi*, there are no third-party "tort victims" in a first-party property insurance case. As to the Colorado Supreme Court's finding that insurance policies tend to be contracts of adhesion, it simply rejects the applicability of that conclusion here because Hiland Hills is "a corporation, not an individual," and that it was assisted by "a sophisticated insurance broker" when it obtained the policy. Owners does not address the third justification given in *Friedland* - that adhering to the traditional rule confers a windfall upon insurers due to mere technical errors by insureds.

This Court finds Owners' efforts to distinguish *Friedland* unpersuasive. The Court accepts, without necessarily deciding, that there is a substantial difference between property and casualty insurance policies (like the Policy here), on one hand, and liability insurance policies (like the ones in *Clementi* and *Friedland*), on the other. Both types of cases are "occurrence" rather than "claims made" based (like the one addressed in *Craft*). The policies in *Clementi* and *Friedland* are closer to the Owners' policy than the policy in *Craft*. Moreover, the Court finds that all three of the concerns that justified the result in *Clementi* and *Friedland* are present in the casualty insurance context.

Insureds seeking liability coverage, like those seeking casualty coverage, do so "for the financial security obtained by protecting themselves from unforeseen calamities and for peace of mind, rather than to secure commercial advantage as with a negotiated business contract." *Friedland*, 105 P.3d at 646. And, in both contexts, the insured seeking property coverage is "typically provided with form contracts promulgated by the insurer, and there is a disparity in bargaining power." *Id.* Owners argues that because Hiland Hills is a "corporation" and used an

11

insurance broker to obtain the Policy, it is unlike individual insureds in *Friedland*. But to the extent *Friedland* considers the identity of the person seeking insurance, the court seemed unconvinced that corporations should be subjected to different rules simply by virtue of being an entity rather than a person. "In protecting themselves against liability and damages, <u>corporations</u> and their officers and directors, <u>like any other persons</u>, seek insurance to defend against possible claims." *Id.* at 646 (emphasis added). Although Hiland Hills might have used a broker to seek out the coverage it wanted, by all appearances from the record, Owners' policy is on the same standard form, with the same terms and policy language, found in countless other cases. There is no indication that Hiland Hills sought, much less that Owners bargained for, anything other than "inclusions and exclusions that other carriers also employ." *Id.* Thus, the casualty property in this case is just as much a contract of adhesion as the liability policy in *Friedland*.

Second, Owners is correct that both *Clementi* and *Friedland* involved third-party claims – that is, an innocent tort victim injured by the insured, seeking to collect from the insured's insurer. This case involves a first-party claim made by Hiland Hills against its own insurer. Although the presence of an innocent tort victim was an express consideration justifying the result of *Clementi* and *Friedland*, this Court is not convinced that the Colorado Supreme Court would find the first-party/third-party distinction meaningful in deciding whether to adopt the notice/prejudice rule in a casualty insurance case. In *Clementi*, the Supreme Court expressly noted its "disapprov[al]" of the lower Colorado courts "extend[ing] our holding in *Marez*" – that is, holding that late notice alone was enough to permit an insurer to disclaim coverage "to non-liability late-notice cases." 16 P.3d at 223, 228 n. 5. All of the cases the Supreme Court specifically singled out for such "disapproval" involved lower state courts rejecting the notice/prejudice rule in <u>first-party</u> claims by insureds for benefits under their own policies. *See*

12

*e.g. Estate of Harry v. Hawkeye-Security Ins. Co.*, 972 P.2d 279, 282 (Colo.App. 1998); *Shelter Mut. Ins. Co. v. Selley*, 942 P.2d 1370, 1373 (Colo.App. 1997). Thus, this Court reads *Clementi* as strongly indicating that *Marez* should <u>not</u> be given effect in the first-party context.

Third, and perhaps most significantly, Owners, like the insurer in *Friedland*, is attempting to "reap a windfall through a technicality" by rejecting coverage due to late notice. 105 P.3d at 646. If Owners has suffered no prejudice due to Hiland Hills' late notice, then its ability to deny benefits on a claim that it would otherwise be required to cover reflects precisely the sort of "windfall" that the notice/prejudice rule seeks to avoid. In the absence of prejudice, the notice requirement is indeed nothing more than a technical requirement whose non-compliance, even if otherwise unexplained and unreasonable, should properly be excused.

Accordingly, to the extent that *Friedland* does not already control the outcome here, this Court is persuaded that the Colorado Supreme Court's analysis in that case would yield the conclusion that the notice/prejudice rule is applicable in the first-party casualty insurance context as well. In this regard, the undersigned simply disagrees with decisions from other judges in this District that have concluded otherwise. *See e.g. Cherry Grove East II Condominium Assn., Inc. v. Philadelphia Ins. Co.,* 2017 WL 6945038 (D.Colo. Dec. 20, 2017) (on identical facts to those herein, finding that *Marez* continues to apply the traditional rule in non-liability cases, but without examining the rationale underlying *Friedland*).

Thus, the Court finds that the notice/prejudice rule applies to Hiland Hills' claim, requiring Owners to demonstrate that it suffered prejudice resulting from Hiland Hills' late notice. The Court now turns to whether Owners has done so.

**C. Prejudice to Owners**

Owners' motion asserts only one way in which it has been prejudiced by Hiland Hills' late notice of its claim: that the late notice made it impossible for Owners to ascertain whether the damage to the roofs occurred as a result of the June 2015 hail storm – within the policy period – or whether it occurred as a result of the May 2016 storm --- outside of the coverage period. The Court finds that this contention fails to demonstrate prejudice to Owners for two reasons, one simple and one more complicated.

The simple reason is that, if the Court concludes that Hiland Hills first obtained actual knowledge of the roof damage on June 10, 2016 – and nothing in Owners' briefing argues for a different discovery date than that identified by Mr. Smock – the uncovered hail storm on May 2016 hail storm had already occurred. If Hiland Hills had given Owners notice of the claim on the very same day that Mr. Smock discovered the damage, Owners would still be in the position of having to determine which of the two hail storms caused the damage.[6] Thus, Hiland Hills' delay in giving notice from June to November 2016 did not cause Owners any greater difficulty in ascertaining which storm caused the roof damage.

The more complicated reason arises from the method Ms. Prom used to reach her conclusions. Reduced to its essence, Ms. Prom's method for determining which storm caused the damage is that "the maximum damage [was] caused by the storm with the largest hailstones." Ms. Prom determined the size of the hail stones from each storm by considering a December 2016 report from a company named CoreLogic. That report revealed that the June 2015 storm produced 1.3" hail stones, while the May 2016 storm produced 1.4" stones. Thus, she

---

[6] Ms. Prom's report notes that a <u>third</u> hail storm hit the area in July 2016. If Owners contended that <u>that</u> storm was the actual cause of the damage to Hiland Hills' property, it might be able to assert that the late notice prejudiced its ability to ascertain the cause of the property damage. But beyond noting that the July 2016 storm occurred, Ms. Prom's report gives no consideration to it as a possible cause of the damage. She opines that "the two storms with the largest hailstones" – the June 2015 and May 2016 storms – are the most likely causal agents.

concluded, the May 2016 storm was the more likely causal agent. However, Hiland Hills has come forward with evidence that, shortly after Mr. Prom obtained her CoreLogic report – but before Ms. Prom issued her own report -- CoreLogic modified the algorithm it used to estimate hail sizes. The new algorithm concluded that the June 2015 storm produced 1.1" hail, whereas the May 2016 storm produced only .9" hail. Thus, to the extent that Ms. Prom's methodology was simply "which storm had the largest hail stones?," there is evidence that would have led her to the opinion that the June 2015 storm (the storm covered by the Policy) was the actual cause of Hiland Hills' loss. Using Owners' own method for determining causation when performed with updated methodology would have left no doubt as to which storm caused the damage. Thus, Owners suffered no prejudice from Hiland Hills' late notice. Although the parties here spend some time arguing about whether Owners acted in bad faith by failing to provide Ms. Prom with the updated CoreLogic report, that question lies beyond the single issue presented in Owners' motion: whether it was prejudiced by the late notice. Because there is, at the very least, a genuine dispute of fact as to whether Owners suffered any prejudice, Owners' motion for summary judgment must be denied.

## CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment (**# 23**) is **DENIED**. The parties shall begin preparation of a Proposed Pretrial Order consistent with the

instructions in Trial Preparation Order issued contemporaneously herewith and shall jointly contact chambers to schedule a Pretrial Conference.

Dated this 20th day of September, 2018, *nunc pro tunc* to Sept. 18, 2018.

**BY THE COURT:**

Marcia S. Krieger
Chief United States District Judge